**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

ESTHER VERA, as personal representative
of MANUEL FLORES, deceased,

      Plaintiff,

v.                                            Civ. No. 16-491 SCY/KBM

SAMUEL RODRIGUEZ, in his individual capacity,
BOARD OF COUNTY COMMISSIONERS OF
BERNALILLO COUNTY, and DAN HOUSTON,
in his individual and official capacities as Bernalillo
County Sheriff,

      Defendants.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendants' Motion for Partial Summary

Judgment No. I: Dismissal of Plaintiff's Fourth Amendment Excessive Force Claim (Doc. 69),

Motion for Partial Summary Judgment No. II: Dismissal of Plaintiff's State Law Claims Against

Defendant Rodriguez (No. 68), Motion for Partial Summary Judgment No. III: Dismissal of

Plaintiff's Municipal Liability (Policies, Customs, Patterns, and Practices), Failure to Train, and

Supervisory Liability Claims (Doc. 75). Having reviewed the Motions, the briefing, the relevant

law and evidence in the record, and otherwise being fully advised, the Court concludes that

Defendants' Motions shall be **GRANTED**.

## I.    FACTUAL BACKGROUND

Except where otherwise noted, the following are the undisputed facts. On August 4,

2013, at 6:04 p.m., Deputy Samuel Rodriguez of the Bernalillo County Sheriff's Department

responded to a dispatch involving a "possible 10-65" in the area of Gun Club Road and Coors

Boulevard in the Albuquerque, New Mexico metropolitan area. Doc. 68-5, Ex. F., p. 2.  In

1

general, a "10-65" is dispatch code for a kidnapping. Doc. 68-6, Ex. H, 18:2-10. The dispatcher relayed that the individual who had called indicated that "there was a subject in a red Dodge trying to take a female." Doc. 68-5, Ex. F, p. 2. The dispatcher stated that the female was last seen wearing "cheetah print clothing and screaming." Doc. 68-5, Ex. F at p. 2.

The events leading to the police dispatch began when Donna Roybal arranged to meet her boyfriend, decedent Manual Flores, at a gas station so that he could return her red Dodge Dakota pick-up truck.[1] Doc. 68-2, Ex. A at 67:11-18; 72:22-73:19. Ms. Roybal arrived at the location with her daughter, Marlaina Prada, in a silver car. Doc. 68-2, Ex. A at 76:1-2; Ex. J (showing silver car). When they met, Flores began threatening Roybal that he would injure her family if she did not leave with him. Doc. 68-2, Ex. A at 75. When Roybal would not leave with Flores, he began physically assaulting her and carried her into the truck. Doc. 68-2, Ex. A at 77:19-78:3, 78:20-24. Roybal eventually jumped out of truck and back into Prada's vehicle. Doc. 68-2, Ex. A at 79:2-6. Prada, with Roybal in the vehicle, then drove away from the gas station while Flores followed them. Doc. 68-2, Ex. A at 84; Doc. 68-4, Ex. D at 16:21-17:2. Jeccika Enriquez and her son, Devante, pulled into the gas station at some point during the encounter between Roybal and Flores. Doc. 68-4, Ex. D at 8:23-9:13. Devante called 911 at approximately the time Roybal and Prada left the gas station with Flores in pursuit. Doc. 68-4, Ex. D at 14:11-18.

After leaving the gas station, Prada and Roybal began traveling northbound along Coors Boulevard. Roybal testified at her deposition that Flores first struck their vehicle when he saw her using her phone to dial 911. Doc. 68-2, Ex. A at 86:20-87:3. After Flores struck the vehicle,

---

[1] Plaintiff does not dispute the events that occurred prior to Deputy Rodriguez's involvement. Plaintiff does object to these facts, however, on the bases that they are irrelevant and prejudicial. While the Court agrees with Plaintiff that Deputy Rodriguez was ultimately unaware of the full extent of events that took place at the gas station and that events unknown to him have no bearing on the Court's analysis of his use of force, *see Phillips v. James*, 422 F.3d 1075, 1081 (10th Cir. 2005), the Court includes a summarized version of these events here to provide context regarding the background of the incident. *See* Doc. 84, p. 3.

Prada began making a u-turn in order to travel southbound on Coors near the Countryside Mobile Home Park. Ex. J at 5:30-5:32. At this point in time, Deputy Rodriguez was approaching the scene driving northbound on Coors. Doc. 68-4, Ex. D at 29:3-9. Deputy Rodriguez engaged his belt tape and activated his siren. Ex. L. As Prada nearly completed the u-turn, Flores intentionally struck her vehicle on the driver's side door. Ex. A at 87:25-88:4; Doc. 68-4, Ex. D at 26:6-14; Ex. J 5:33-35; Ex. K 5:33-35. The impact forced Prada's car onto the side of the road where it knocked over a stop sign. Ex. J 5:25. Prada then drove back onto the roadway and came to a stop on the shoulder of the road a few yards from the initial impact. Ex. J at 5:43-48. Flores surged forward and intentionally struck the vehicle again in the rear. Ex. J 5:48-51. At this point, Roybal exited the silver car hoping that it would protect her daughter, who was still in the car with her, from Flores. Doc. 68-2, Ex. A at 89:23-90:7; Ex J 6:05. Roybal then began running toward the mobile home parking lot between the silver vehicle and a guardrail. Doc. 68-2, Ex. A 90:8-10; Doc. 68-4, Ex. D 27:17-20; Ex. J 6:05-6:07; Doc. 68-8, Ex. M at 8:2-12. Flores pursued Roybal as she ran and nearly struck her with his truck. Doc. 68-4, Ex. D at 27:17-21; Doc. 68-6, Ex. H at 70:5-14; Ex. J 6:05-07. After attempting to strike Roybal, Flores drove into the mobile home parking lot, turned around, and began to proceed toward southbound Coors. Ex. J at 6:13-22; Ex. K at 6:13-22.

As Flores was exiting the mobile home parking lot, Deputy Rodriguez was approaching the same parking lot in the northbound lane of Coors. Ex. J at 6:20-22. Deputy Rodriguez had witnessed Flores strike Prada's vehicle as well as his attempt to hit Roybal while she was running. Doc. 68-6, Ex. H at 68:19-21, 90:10-20. As Deputy Rodriguez began to turn into the mobile home parking lot, Flores struck the driver's side of Deputy Rodriguez's patrol car. Ex. J at 6:22-26; Ex. K at 6:22-26; Ex. L at 0:58-1:02. The parties dispute whether this first strike

pinned Deputy Rodriguez's legs and prevented him utilizing either the gas or brake pedals. The surveillance video shows that after the first strike Deputy Rodriguez's unit rolled forward a few feet before coming to a complete stop and thereafter did not move. Ex. J. at 6:30-35.

After striking Deputy Rodriguez's vehicle, Flores left the scene proceeding southbound on Coors. Ex. J at 6:34-36. Deputy Rodriguez reported to dispatch that Flores had struck his vehicle and had left the mobile home parking lot. Ex. L at 1:01-04. Flores, however, turned around and began heading back toward the mobile home parking lot. Ex. K at 6:36-37. Approximately twenty seconds elapsed between Flores' first impact with Deputy Rodriguez's vehicle and his return to the scene. Ex. J at 6:40-42. As Flores approached Deputy Rodriguez's position, Deputy Rodriguez began frantically attempting to open his car door from the outside in order to exit the vehicle but the door was stuck shut from the first impact. Ex. J at 6:36-40. Flores accelerated straight for Deputy Rodriguez's unit and again struck it in the driver's side door. Ex. J at 6:40-42. The force of this collision drove both vehicles into the mobile home parking lot. Ex. J at 6:44-46. This second collision caused significant damage to Deputy Rodriguez's vehicle and resulted in his legs being pinned inside his unit. Ex. N-1 – N5; Doc. 68-6, Ex. H at 57:22-58:1.[2]

After striking Deputy Rodriguez's vehicle for the second time, Flores stepped out of the truck and threw his hands in the air and screamed inaudibly. Ex. J 6:47-48; Ex. L 1:22-1:26. The parties offer differing interpretations of the nature and intent of Flores "throwing his hands in the air." Defendants contend that it was an aggressive or challenging action whereas Plaintiff posits that it was an act of surrender. Based on the surveillance video evidence, it is clear that Flores

_____

[2] The parties dispute the extent of Deputy Rodriguez's field of vision after the second collision. *See* Doc. 68, Defendants' Undisputed Material Facts Nos. 87, 94; Doc. 84, Plaintiff's Disputed Facts Nos. 5, 10 Given the Court's analysis below, however, the Court concludes that resolution of the issues presented in this case renders it unnecessary to resolve whether Plaintiff has proffered sufficient evidence to place this fact in dispute.

did not immediately raise his hands above his head upon exiting the truck.[3]  Ex. J at 6:47.

Instead, Flores initially raised his arms to mid-torso height with his hands extended outward

from his body as he stepped around the truck's door and away from the vehicle. Ex. J at 6:47.

Flores held this pose for approximately two to three seconds before throwing his hands above his

head. Ex. J at 6:47-6:50. At that point, Deputy Rodriguez shot him twice in the chest.  Ex. J at

6:50-52; Ex. L at 1:24-27.  Deputy Rodriguez did not give any verbal warnings before firing. Ex.

5 at 45:16-20, 50:6-13. Flores died as a result of these gunshots.

After the shooting, Deputy Rodriguez remained trapped in his vehicle. Ex. J at 6:55.

Three bystanders ultimately assisted him in exiting the vehicle through the passenger side door.

Ex. J at 8:10.  Approximately one minute and forty-five seconds later, additional BCSO deputies

arrived on the scene.  Ex. J at 8:30.

## II.  STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). There is no genuine dispute as to any material fact unless the evidence is such that

a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986). In reviewing a motion for summary judgment, the Court views

---

[3] While a court generally construes all reasonable inferences in the non-moving party's favor at the summary judgment stage, when there is "clear contrary video evidence of an incident," the court is not bound to adopt the plaintiff's interpretation of those events. *See Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010).  It is clear from the video evidence that Flores does not immediately raise his hands above his head in a gesture indicative of surrender upon exiting the truck.  This interpretation is furthermore confirmed by eyewitness Frank Pena's deposition testimony of Flores' actions when he exited the truck. *See* Doc. 84-1 at 20:4-11 (testifying that Flores' hands were "[a]bout midway up and to the side. So it wasn't up like surrender, it was up to the side like palms up…").  That said, the Court will not construe Flores' actions as "challenging" when he exited the truck as that would inappropriately resolve a factual dispute.  To be clear, although a factfinder could reasonably conclude that no action by Flores after exiting the truck indicated an intent to surrender, the Court, construing reasonable inferences in Plaintiff's favor, will assume for purposes of these Motions, that Flores threw his hands above his head in act of surrender in the one to two seconds before he was shot.

the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th Cir. 2013) (quotation omitted). Initially, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.*

## III. ANALYSIS

Broadly speaking, Defendants' Motions raise three main issues. Defendants' first Motion contends that summary judgment should be entered in their favor on Plaintiff's Fourth Amendment excessive force claim. Doc. 69. More specifically, Defendants argue that Deputy Rodriguez is entitled to qualified immunity because he used an objectively reasonable amount of force when he shot Flores and, alternatively, that the law was not clearly established that the use of deadly force under these circumstances was objectively unreasonable. Defendants' second Motion contends that Plaintiff's state law claims for wrongful death against Deputy Rodriguez should be dismissed. Doc. 68. Defendants' third Motion challenges Plaintiff's claims for municipal and supervisory liability under state and federal law. Doc. 75. The Court will address these Motions in turn.[4]

### A. Plaintiff's Fourth Amendment Claim

Defendants assert that Deputy Rodriguez is entitled to qualified immunity on Plaintiff's excessive force claim under the Fourth and Fourteenth Amendment. Doc. 69. Qualified immunity protects public officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

---

[4] As the Court set forth in a previous Order (Doc. 124), Defendants should in the future file one omnibus motion for summary judgment rather than a series of related motions for summary judgment.

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When a defendant asserts qualified immunity at the summary judgment stage, the burden shifts to the plaintiff to show (1) the defendant violated a constitutional right, and (2) the constitutional right was clearly established at the time of the defendant's conduct, i.e. the contours of the right were sufficiently well developed that a reasonable official should have known his conduct was unlawful. *Courtney v. Okla. ex rel. Dep't of Pub. Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013). The overarching inquiry is whether the law at the time of the defendant's conduct provided the defendant with "fair notice" regarding the legality of that conduct. *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004). As is commonly reiterated, qualified immunity provides "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)). While the Court may first address either prong of the analysis, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), the Court will begin with Defendants' argument that the force Deputy Rodriguez utilized was objectively reasonable.

i.     ***The Force Deputy Rodriguez Employed was Objectively Reasonable***

Excessive force claims are analyzed under the reasonableness requirement of the Fourth Amendment. *See Graham v. Connor,* 490 U.S. 386, 395 (1989); *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008). "To establish a constitutional violation, the plaintiff must demonstrate the force used was objectively unreasonable." *Larsen*, 511 F.3d at 1259. "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Reasonableness is determined based on the information possessed by

the officer at the moment that force is employed, *see Weigel v. Broad*, 544 F.3d 1143, 1152 (10th Cir. 2008), but the inquiry does not take into account the specific officer's intent or motivation. *Graham*, 490 at 397. The Court must assess "objective reasonableness based on whether the totality of the circumstances justified the use of force and pay careful attention to the facts and circumstances of the particular case." *Larsen*, 511 F.3d at 1260 (internal quotation marks and citation omitted). This includes consideration of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting or attempting to evade arrest by flight." *Graham*, 490 U.S. at 397. "While these are the most common considerations, they are not 'a magical on/off switch that [constitute] rigid preconditions' to determine whether an officer's conduct constituted excessive force." *Davenport v. Causey*, 521 F.3d 544, 551 (6th Cir. 2008) (citing *Scott v. Harris*, 550 U.S. 372 (2007)).

There can be no genuine dispute in this case that Deputy Rodriguez initially possessed justification to use deadly force during this incident. "Deadly force is justified under the Fourth Amendment if a reasonable officer in [the defendant's] position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." *Sevier v. City of Lawrence, Kansas*, 60 F.3d 695, 699 (10th Cir. 1995); *Thomas v. Durastanti*, 607 F.3d 655, 664 (10th Cir. 2010) ("The use of deadly force is not unlawful if a reasonable officer would have had probable cause to believe that there was a threat of serious physical harm to himself or others"). "Probable cause, while incapable of precise definition, means that the facts and circumstances of which the officer is aware and are reasonably viewed as accurate are sufficient unto themselves to warrant a man of reasonable caution to believe that deadly force is necessary." *Davenport*, 521 F.3d at 551 (6th Cir. 2008) (internal quotation marks and citation

omitted). As articulated by the United States Supreme Court, "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985).

Courts have routinely held that deadly force may be justified where a suspect threatens to hit or run over an officer with a vehicle. *See Thomas*, 607 F.3d at 664 ("if threatened by [a] weapon (which may include a vehicle attempting to run over an officer), an officer may use deadly force"); *Lytle v. Bexar County, Tex.*, 560 F.3d 404, 412 (5th Cir. 2009) (stating that it would be a reasonable use of force to shoot suspect backing vehicle toward the officer due to "the threat of immediate and severe physical harm that the reversing [car] posed to [the officer]"); *Waterman v. Batton*, 393 F.3d 471, 478 (4th Cir. 2005) (concluding that a suspect who accelerated his vehicle toward officers "posed an immediate threat of serious physical harm"). Because the threat of hitting an officer with a vehicle may justify the use of deadly force, it is axiomatic that *actually* hitting an officer with a vehicle may justify the use of deadly force. *See Hathaway v. Bazany*, 507 F.3d 312, 322 (5th Cir. 2007) (concluding deadly force was justified where the suspect struck the officer with his car); *Herman v. City of Shannon, Mississippi*, 296 F.Supp.2d 709, 713-14 (N.D. Miss. 2003) (concluding that the suspect "posed a threat of serious physical harm to [the officer], considering that [the suspect] gunned the engine of his vehicle (a potentially deadly weapon) at an armed police officer standing mere feet in front of him").

In the present case, not only did Deputy Rodriguez have probable cause to believe that Flores posed an immediate threat to his and other's safety, he had actual knowledge. Deputy Rodriguez was aware prior to his arrival on scene that a suspect in a red pick-up truck was

involved in a possible kidnapping. Upon arriving at the scene, it is undisputed that Deputy Rodriguez witnessed the truck, with Flores at the wheel, strike the silver car. Flores struck the car with enough force to push it off the road. Deputy Rodriguez further witnessed Flores attempt to strike Roybal as she fled on foot from the silver car. Then, as Deputy Rodriguez attempted to enter the mobile home parking lot, Flores struck Deputy Rodriguez's unit with enough force to, at the least, incapacitate the driver's side door and thereby prevent Deputy Rodriguez from exiting from that side. Flores then fled the scene for approximately twenty seconds only to return and violently strike Deputy Rodriguez's unit again in the driver's side door. Under such facts, no reasonable jury could conclude that Flores did not pose an immediate threat to the safety of Deputy Rodriguez and others during these events.

The crux of the issue in this case, however, is whether it was objectively reasonable for Deputy Rodriguez to use deadly force against Flores in the moments after Flores got out of the pick-up truck. As Plaintiff notes, Flores was otherwise unarmed and so the truck was his only weapon. Further, in drawing reasonable inferences in Plaintiff's favor as the Court must, the Court further assumes Flores raised his hands in an act of surrender in the less than two seconds before he was shot. Plaintiff contends that it was therefore objectively unreasonable for Deputy Rodriguez to use deadly force against an unarmed, surrendering suspect. As explained below, however, Plaintiffs' argument takes a too narrow view of the threat Flores posed to Deputy Rodriguez and others during the incident.

Plaintiff's focus on Flores' actions at the precise moment he was shot is myopic. Plaintiff's argument is premised on statements in caselaw indicating that a court is to evaluate whether the officers are in danger "at the precise moment that they used force." *Thomson v. Salt Lake County*, 584 F.3d 1304, 1315 (internal quotation marks and citation omitted); *Sevier*, 60

F.3d at 699, and that justification for the use of force can dissipate within seconds. *See Waterman*, 393 F.3d at 481 ("We therefore hold that force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated.); *Lytle*, 560 F.3d at 413 ("an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased"); *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity."). However, as the Tenth Circuit has stated, the "totality of the circumstances…is the touchstone of the reasonableness inquiry." *See Thomson*, 585 F.3d at 1318; *see also See Mendez v. Poitevent*, 823 F.3d 326, 333 (5th Cir. 2016) ("we must consider all of the circumstances leading up to that moment, because they inform the reasonableness of [the officer's] decisionmaking"). Accordingly, "[s]trict reliance on the precise moment factor is inappropriate when the totality must be considered." *Thomson*, 585 F.3d at 1318; *Phillips v. James*, 422 F.3d 1075, 1083 (10th Cir. 2005) (rejecting strict reliance on evaluating threat to officer at "precise moment" officer used force due to the "extremely relevant" behavior of the plaintiff prior to the shooting).

As explained more below, given the severity of Flores' actions in the minutes leading up to shooting, this case presents a situation in which the totality of the circumstances stand in stark contrast with Flores' behavior in the split-second before he was shot. Stated another way, the Court cannot disregard the "extremely relevant" nature of Flores' behavior throughout the incident in favor of singular focus on a snapshot of Flores' actions the moment Deputy Rodriguez pulled the trigger. *See Mendez v. Poitevent*, 823 F.3d 326, 333 (5th Cir. 2016) (rejecting the plaintiff's narrow focus on the fact that the decedent was fleeing the officer at the

time of the shooting where before the shooting the decedent had extensively fought with the officer).  Accordingly, the Court rejects Plaintiff's framing of the issue as a basic determination of whether it is objectively reasonable for an officer to shoot an unarmed or surrendering individual.  While relevant, Flores' act of throwing his hands into the air the moment before he was shot is but one event among many the Court considers in determining whether Deputy Rodriguez's use of force was objectively reasonable.

The reasonableness inquiry has long taken into account "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 396-97.  Accordingly, some measure of deference is due an officer's use of force in such circumstances. *See Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (reiterating that "judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation."); *Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005) ("What may later appear to be unnecessary when reviewed from the comfort of a judge's chambers may nonetheless be reasonable under the circumstances presented to the officer at the time"); *Davenport*, 521 F.3d at 552 (stating that a court is "required to provide a measure of deference to the officer's on-the-spot judgment about the level of force necessary" especially in situations "when all parties agree that the events in question happened very quickly" (internal quotation marks and citation omitted)).  For this reason, courts have further concluded that "even if an officer reasonably, but mistakenly, believed that a suspect was likely to fight back…the officer would be justified in using more force than in fact was needed." *Larsen*, 511 F.3d at 1260 (internal quotation marks and citation omitted); *Thomson*, 584 F.3d at 1315 (same); *Thomas v. Durastanti*, 607 F.3d 655, 666 (10th Cir. 2010) ("An officer may be

found to have acted reasonably even if he has a mistaken belief as to the facts establishing the existence of exigent circumstances").

Taking the totality of the circumstances into account, the Court concludes that, even assuming Flores intended to surrender when he exited the truck, a reasonable officer in Deputy Rodriguez's position would have neither the time nor the opportunity to recognize that Flores no longer posed a threat to his and other's safety. First, it is important to break down exactly what happened during the approximately four to five seconds that elapsed from the time Flores exited the truck until he was shot. The video evidence clearly shows that, when Flores initially exited the truck, he had his arms at mid-torso level and spread out in a gesture not immediately indicative of surrender. Flores did not fully raise his hands above his head in a gesture that could reasonably be associated with surrender until the final one to two seconds before he was shot. Deputy Rodriguez therefore had a mere few seconds after being violently struck for a second time to retrieve his weapon, point it at Flores, and assess whether Flores still presented a threat. Thus, this situation presented the exact type of "tense, uncertain, and rapidly evolving" circumstances contemplated by *Graham*.

Second, in the short time Deputy Rodriguez had to assess whether Flores still posed a threat, a reasonable officer in Deputy Rodriguez's position would have little to no reason to infer that it was Flores' intention to surrender when he exited the truck. Indeed, all signs pointed toward a continuation of the attack. For instance, Flores ostensibly had an opportunity to flee the scene after first striking Deputy Rodriguez's unit. As evidenced by the surveillance video, Flores did, in fact, leave the scene for approximately twenty seconds after striking Deputy Rodriguez's unit the first time. Instead of fleeing, however, Flores turned the truck around and directed it straight into the driver's side door of Deputy Rodriguez's unit. The violence of this

impact can hardly be understated and the motivation cannot be interpreted as anything other than an intent to seriously injure or kill Deputy Rodriguez. Under such circumstances, it would be completely reasonable for an officer in Deputy Rodriguez's position to assume that Flores intended to continue the attack by any means available to him once he exited the truck. The Court finds the notion unreasonable that in the span of five seconds an officer could be expected to process that a suspect who just had the opportunity to make a getaway but instead chose to return and attempt to kill or seriously injure him would then decide to immediately surrender once he had incapacitated the officer. That may have been Flores' intention but the Court's analysis focuses on whether a reasonable officer would believe that Flores still posed an immediate and severe threat. *See Wilson v. Meeks*, 52 F.3d 1547, 1553-54 (10th Cir. 1995) *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001) ("Qualified immunity does not require that the police officer know what is in the heart or mind of his assailant. It requires that he react reasonably to a threat."); *Powell v. Fournet*, 846 F.Supp. 1443, 1446 (D. Colo. 1994) ("Although the amount of force may seem unnecessary in hindsight and with the benefit of understanding the [p]laintiff's motives and thoughts, it is not that perspective which controls, but rather what a reasonable officer in the [specific officer's] shoes would have done.").

Third, the reasonableness of Deputy Rodriguez's decision to use deadly force is not limited to the perception that Flores would continue the attack on him once he exited the truck but instead may include a reasonable belief that Flores presented a threat to others or was attempting to flee after the commission of a significant violent crime. As the Supreme Court stated in *Garner*, "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible,

some warning has been given." 471 U.S. at 11-12; *see also Ryder v. City of Topeka*, 814 F.2d 1412, 1419 (10th Cir. 1987) (stating that an officer's belief that a suspect poses a threat of serious harm is justified where "the suspect has placed the officer in a dangerous, life threatening situation" or "where the suspect is fleeing from the commission of an inherently violent crime."). Not only was Deputy Rodriguez the victim of Flores' attempts to severely injure or kill him, he was also aware of Flores' previous attempts to severely injure or kill Prada and Roybal. Given this background, it would also be reasonable for an officer in Deputy Rodriguez's trapped position to believe that Flores might resume his attack on Roybal or, at a minimum, imperil others in an attempt to flee from the commission of his inherently violent crimes. Accordingly, under *Garner*, Deputy Rodriguez would be justified in utilizing deadly force even if his belief that the threat Flores posed was not based on the specific threat Flores posed to Deputy Rodriguez.

Plaintiff rightfully notes that Deputy Rodriguez did not issue a warning prior to firing and *Garner* requires an officer to give a warning "where feasible" prior to utilizing deadly force. Although there is little authority on the boundaries of the feasibility requirement, the Court concludes that *Garner* would not require a warning under these circumstances. In *Ridgeway v. City of Woolwich*, the court held that a warning was not required where an officer could reasonably believe that plaintiff's previous actions clearly evidenced a disregard for police authority and could result in deadly force being used against him. 924 F.Supp. 653, 660 (D.N.J. 1996). In addition to committing a violent robbery, the plaintiff in *Ridgeway* deliberately rammed two police cars on three occasions before fleeing on foot. *Id.* at 658. The Court stated it was reasonable for the officer to believe that the plaintiff was aware that deadly force may be employed against him after directly ramming officers on three occasions and his willingness to

use violence to evade capture indicated the likelihood that he would not respond at all to a warning. *Id.* at 660.

For similar reasons, an officer in Deputy Rodriguez's position would reasonably believe that a warning was not feasible given Flores' previous actions. Like *Ridgeway*, an officer would be justified in believing that Flores' actions in twice ramming Deputy Rodriguez indicated a complete disregard for police authority. An officer would furthermore be justified in believing that Flores was aware that attempting to kill or severely injure the officer by ramming him with the vehicle could result in the employment of deadly force against him. The Court therefore concludes that *Garner* would not require that a warning be given in this case prior to the utilization of deadly force.

Finally, the Court briefly returns to Plaintiff's contention that the justification for deadly force no longer existed the moment Deputy Rodriguez pulled the trigger. The circumstances facing Deputy Rodriguez stand in contrast to those situations in which courts have held that the officer should have recognized that the justification for the use of deadly force had passed within a mere few seconds. In *Waterman*, for instance, the Court held that officers who shot a suspect that accelerated his vehicle toward them were justified in shooting the suspect as he drove toward them but not once he passed the officers. *See Waterman*, 393 F.3d at 478, 482. The most obvious distinction from *Waterman*, of course, is that Flores did not pass Deputy Rodriguez in the truck but instead violently struck him, twice. As the court in *Waterman* explained in differentiating between the initial justified shots and the subsequent unjustified shots, "once Waterman's vehicle passed the officers, the threat to their safety was eliminated." *Id.* at 482. Further, because the plaintiff did not attempt to strike the officers, it was reasonable to conclude that "any belief that the officers continued at that point to face an imminent threat of serious

physical harm would be unreasonable." *Id.*

Similarly, in *Lytle*, the Court concluded that an officer had sufficient time to reassess the threat initially posed to him when he fired on a suspect's vehicle approximately "three to four houses down the block." 560 F.3d at 409, 415. The suspect in *Lytle* had fled after the officer had attempted to initiate a traffic stop. During the pursuit, the suspect took a wide turn and struck a vehicle in on-coming traffic before coming to a stop. *Id.* at 407. The officer stopped "twelve to fifteen" feet behind the suspect. *Id.* The suspect then backed up toward to the officer's unit in an attempt to free himself from the collision and then began driving away. *Id.* at 409. The officer then fired when the suspect's vehicle was down the block, ultimately striking and killing one of the occupants. *Id.* at 408. While the *Lytle* court stated that the suspect posed an immediate threat to the officer when backing up, it was for a jury to determine whether the "three to ten seconds, perhaps even more" that it took the vehicle to come to a complete stop after backing up and then drive down the block gave the officer sufficient time to perceive that the threat to him had passed. *Id.* at 413-14.

In the present case, however, the distinction is, again, the difference between a threat being based on the potential that the suspect may strike the officer and the suspect actually doing so. Any fear the officer in *Lytle* initially had that the suspect was attempting to strike him when backing up dissipated when the vehicle began driving away from him. That was not the case here. A reasonable officer in Deputy Rodriguez's position could not be expected to have the situational awareness to process in a matter of seconds that a suspect who just intentionally tried to kill or seriously injure him no longer posed a threat merely by exiting his vehicle and, in the final instant, throwing his hands in the air. Flores' violent and unpredictable actions during the incident necessitated quick and decisive action. In hindsight, a court may find room to second

guess law enforcement's choice to use deadly force but the "Constitution simply does not require police to gamble with their lives in the face of a serious threat of harm." *Waterman*, 393 F.3d at 479 (internal quotation marks and citation omitted). For these reasons, the Court concludes that Deputy Rodriguez's use of force was objectively reasonable and he accordingly did not violate Flores' Fourth Amendment rights.

### ii.    Clearly Established

For many of the same reasons the Court finds that Deputy Rodriguez did not violate Flores' constitutional rights, the Court further concludes that no clearly established law existed to place Deputy Rodriguez on notice that his conduct was unlawful.

Plaintiff bears the burden of establishing that the defendant's conduct violated clearly established law. *Guffey v. Wyatt*, 18 F.3d 869, 871 (10th Cir. 1994). To be clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010). The Supreme Court has emphasized that "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015). Furthermore, the Supreme Court recently reiterated "the longstanding principle that 'clearly established law' should not be defined at a high level of generality." *White v. Pauly*, 137 S.Ct. 548, 552 (2017) (citation and quotation marks omitted). "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix*, 136 S.Ct. at 308 (internal quotation marks and citation omitted). Accordingly, "[t]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (internal quotation marks and citation omitted).

Similar to Plaintiff's arguments regarding the constitutionality of Deputy Rodriguez's use

of force, Plaintiff contends that it is clearly established law that an officer cannot use deadly force against an unarmed, surrendering suspect.  Plaintiff cites a host of cases standing for this proposition.  *See e.g., White v. Gerardot*, 509 F.3d 829, 833, 836 (7th Cir. 2007) (stating that the officer would not likely be entitled to qualified immunity where the plaintiff "had his hands in the air and was surrendering"); *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 607 (6th Cir. 2006) ("Because [the plaintiff] had surrendered before being struck, a reasonable jury could conclude that [the officer's] strike to [his] head was unjustified and excessive….We have held repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law.").  The Court agrees that police may not shoot a clearly surrendering, non-threatening, suspect. *See Murphy v. Bitsoih*, 320 F.Supp.2d 1174, 1193 (D.N.M. 2004) ("It also is a well-settled and long-standing principle that the use of deadly force on an unarmed and unthreatening suspect constitutes unreasonable excessive force under the Fourth Amendment.").  Despite Plaintiff's framing of the issue, however, this case does not involve a clearly surrendering, non-threatening, suspect.

Following the Supreme Court's directives to avoid generalities, the proper framing of the issue is whether the law was clearly established that it was objectively unreasonable for an officer to use deadly force against an individual the officer witnessed intentionally strike a vehicle with passengers inside, attempt to run over a passenger who tried to flee on foot, who then intentionally struck the officer's own vehicle twice in an attempt to incapacitate, kill, or seriously injure the officer, and who only threw his hands in the air a mere one to two seconds before the trapped officer pulled the trigger of his gun.  At the time Deputy Rodriquez shot Flores, any reasonable officer in Deputy Rodriquez's position would not have had sufficient time to process that Flores no longer posed a serious continuing threat to himself and others.  While

the Court will not set forth an analysis of every case Plaintiff cites, none of these cases involve a trapped officer having to make a split-second decision about whether an assailant who has just made multiple attempts to kill the officer and others continues to pose a deadly threat when the assailant throws his hands up in the air just as the officer is about to shoot him. *See e.g. Baker*, 471 F.3d at 603 (finding that the officer violated clearly established law when he struck a suspect with his "arms straight up to indicate that he had surrendered" who had not attacked officers but instead fled after an attempted *Terry* stop); *Becker v. Elfreich*, 821 F.3d 920, 924 (7th Cir. 2016) (stating that the plaintiff was walking down stairs with his hands above his head when the officer released his service dog and permitted it to continuously attack the plaintiff); *Gerardot*, 509 F.3d 829, 833 (stating that the officer shot the suspect when he was turning around with his hands in the air after the officer approached him from behind while he was unlocking his car door).

In the present case, Flores' actions can hardly be compared to the suspects' behavior prior to the use of force in the above cases. As the Court concluded above, a reasonable officer could infer that Flores had no intention of surrendering when Flores exited the truck after directly striking him a second time and that Flores intended to continue his assault on either the officer or others by any means necessary. As such, this case does not fall under the rubric of situations where the officer unlawfully used force against an unarmed, non-threatening, and surrendering suspect. *See Carr*, 337 F.3d at 1227 (finding that the law was clearly established that an officer cannot use deadly force against an unarmed fleeing suspect pursuant to *Garner*). Thus, Plaintiff fails to proffer clear authority as to the limits of an officer's use of force in the situation Deputy Rodriguez found himself. In the absence of authority governing the particular circumstances this case presents, the Court cannot conclude that existing precedent has placed the constitutional question beyond debate, thereby placing Deputy Rodriguez on notice that his

use of deadly force against Flores was unconstitutional. *See White*, 137 S.Ct. at 551-552.

**B. Plaintiff's State Law Claims Against Deputy Rodriguez**

Plaintiff asserts two state law claims against Deputy Rodriguez: (1) wrongful death by battery pursuant to NMSA 1978, 41-4-12 (Doc. 37 at 12) and, alternatively, (2) wrongful death by negligence pursuant to NMSA 1978, 41-4-6 (Doc. 37 at 13). The Court will address these claims in turn.

### i.    *Plaintiff's Claim for Battery*

The New Mexico Tort Claims Act, NMSA 1978, § 41-4-1 through § 41-4-27, "shields government entities and public employees from tort liability unless immunity is specifically waived by the Act." *Archibeque v. Moya*, 1993-NMSC-079, ¶ 5, 866 P.2d 344. Plaintiff's battery claim arises under Section 41-4-12, which provides that law enforcement officers may be liable for "wrongful death…resulting from…battery…or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico" when the officer is acting within the scope of his or her duties.  "New Mexico's civil-battery is modeled after the *Restatement (Second) of Torts*." *Pena v. Greffet*, 108 F.Supp.3d 1030, 1061 (D.N.M. 2015). Under the *Restatement*, a tortfeasor is liable for battery when "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive contact with the person of the other directly or indirectly results."  *State v. Ortega*, 1992-NMCA-003, ¶ 12, 87 P.2d 152 (citing Restatement (Second) of Torts § 18); *see also Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1208-09 (10th Cir. 2006). In cases where the alleged tortfeasor is a law enforcement officer, however, "an officer is permitted a privilege under New Mexico law, and will not be civilly liable, if the officer acts with a reasonable belief that the amount of force used is

necessary under the circumstances." *Fancher v. Barrientos*, Civ. No. 11-118 LH/LAM, 2012 WL 12838429, *18 (D.N.M. June 13, 2012). Accordingly, "an officer or entity may successfully defend against a charge of battery by demonstrating that (1) the officer used no more force than reasonably was necessary, and (2) the officer acted in good faith." *Id.* "Generally, the question of reasonableness of the officer's actions in using lethal force to apprehend a felon is a question of fact for the jury." *Id.* "New Mexico courts, however, have demonstrated a willingness to grant summary judgment to police officers when the facts show that they acted reasonably under the circumstances." *Id.* (citing *Alaniz v. Funk*, 1961-NMSC-140, 364 P.2d 1033). Thus, if after drawing all reasonable factual inferences in a favor of the plaintiff, the Court determines that no reasonable jury could decide in the plaintiff's favor, the Court may grant a motion for summary judgment on a battery claim. *See State v. Ellis*, 2008-NMSC-032 ¶ 17, 186 P.3d 245.

While New Mexico courts do not grant law enforcement officers qualified immunity, the parties agree that the applicable standard under New Mexico law is one of "objective reasonableness" and therefore closely mirrors the first prong of the qualified immunity analysis under federal law. *See* Plaintiff's Response Brief, Doc. 85 at 3 (stating that the "analysis under state law strongly resembles that under federal law" and incorporating by reference his arguments as to the unreasonableness of Deputy Rodriguez's actions). Indeed, in *Archuleta v. LaCuesta*, the New Mexico Court of Appeals echoed *Graham* in stating that "[t]he reasonableness of the use of deadly force in any particular situation is an objective test from the perspective of the officer on the scene, with the understanding that officers must often make split-second decisions in difficult situations about what force is necessary." 1999-NMCA-033, ¶ 8, 988 P.2d 883. Accordingly, the Tenth Circuit has indicated that summary judgment should be granted on state law battery claims where the court has previously concluded that the officer's

use of force was objectively reasonable when applying the first prong of the qualified immunity analysis. *See Youbyoung v. Gaitan*, 680 Fed. App'x 724, 744 (10th Cir. 2017) (unpublished) (holding that it was proper for district court to dismiss a battery claim under New Mexico law where the court had previously concluded that the officers did not employ unconstitutionally excessive force); *see also Fancher*, 2012 WL 12838429, *18 ("For the same reasons given [in the court's federal objective reasonableness analysis], the court concludes as a matter of law that [the officer's] actions were reasonable and necessary as to his firing of the initial shot.").

Ultimately, while New Mexico courts emphasize that reasonableness is most often a question of fact for the jury, the Court concludes that there is nothing sufficiently unique between the federal and state law "objective reasonableness" standards that would justify reaching separate conclusions under the facts presented in this case. Accordingly, because the Court previously concluded that Deputy Rodriguez's actions were objectively reasonable, the Court similarly concludes that no reasonable jury could decide in Plaintiff's favor on Plaintiff's state law battery claim. *See Ellis*, 2008-NMSC-032 ¶ 17.

### ii.     *Plaintiff's Negligence Claim*

Plaintiff's negligence claim is premised on Deputy Rodriguez's alleged negligent use of his firearm. Doc. 37 at ¶¶ 51-53. The New Mexico Tort Claims Act contains a waiver of immunity where "the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any public building, public park, machinery, equipment or furnishings" results in "bodily injury, wrongful death, or property damage." NMSA 1978, § 41-4-6. Defendants contend that summary judgment should be entered in their favor on this claim because Deputy Rodriguez intentionally, not negligently, shot Flores and, alternatively, Plaintiff has not established that Deputy Rodriguez's use of his firearm put the general public at

risk as required by the statute.  Doc. 68 at 20, 23.

A law enforcement officer can be liable for negligent use of equipment pursuant to this provision of the New Mexico Tort Claims Act when his or her conduct puts the general public at risk.  *See Oliveros v. Mitchell*, 449 F.3d 1091, 1096-97 (10th Cir. 2006).  Plaintiff contends that Deputy Rodriguez put the public at risk because he fired into a mobile home parking lot with bystanders present when he shot Flores.

The waiver of immunity under Section 41-4-6 applies when the injury, be it bodily injury, wrongful death, or property damage, is "caused by the negligence of the public employee…." It is undisputed that Deputy Rodriguez intentionally shot Flores; that is, Deputy Rodriguez intended the express harm Flores suffered. *See Garcia v. Gordon*, 2004-NMCA-114, ¶ 6, 98 P.3d 1044 (recognizing that an intentional tort "by its very nature intends the harm" suffered (internal quotation marks and citation omitted)). By way of distinction, the plaintiff's injury in *Oliveros* resulted from an accidental shooting by the police officer (at least, insofar as the claim under Section 41-4-6 was concerned).  That is, the injury alleged by the plaintiff was a result of the allegedly negligent operation of the defendant's firearm. Thus, *Oliveros* provides little support for Plaintiff's claim apart from the general proposition that a law enforcement officer may be liable under Section 41-4-6 where the officer's negligence causes the alleged harm. Further, Plaintiff cites no other authority for the proposition that Section 41-4-6 has been construed to encompass intentional torts by public employees, much less that intentional conduct may sound in negligence generally under New Mexico law. Indeed, they are distinct. *See* § 41-4-12 (expressly providing that immunity is waived for intentional torts such as assault, battery, and false imprisonment); *Gordon*, 2004-NMCA-114, ¶ 9 (recognizing that "intentional conduct is purposeful and directed toward a specific end, while negligent conduct is careless or accidental"

(internal quotation marks and citation omitted)).  Ultimately, while a bystander could possibly assert a cause of action if one had been injured by a stray bullet fired by Deputy Rodriguez, Plaintiff's theory of liability attempts to conflate the duty Deputy Rodriguez owed to the bystanders with the harm Flores ultimately suffered.  Stated another way, it cannot be said that a police officer owes a suspect a duty of ordinary care in the operation of his firearm when the officer intentionally shoots the suspect pursuant to a lawful use of force.  This mishmash theory of liability does not support either a waiver of immunity under Section 41-4-6 or state a cause of action for negligence for Flores' injury. The Court therefore grants summary judgment to Defendants on Plaintiff's negligence claim.

### C.  Plaintiff's Municipal and Supervisory Claims

Defendants' Third Motion for Partial Summary Judgment challenges Plaintiff's claims against County Defendants.  Doc. 75. This includes Plaintiff's claim for municipal liability against Defendant Bernalillo Board of County Commissioners under Section 1983 (Count V), supervisory liability of Defendant Houston under Section 1983 (Count VI), state law tort claim for wrongful death against Defendant Bernalillo Board of County Commissioners (Count IV), and state law tort claim for wrongful death against Defendant Houston (Count VII).

### i.  *Plaintiff's Claims for Municipal and Supervisory Liability under Section 1983*

As Plaintiff acknowledges, Counts V and VI are premised on an unconstitutional violation by Deputy Rodriguez. *See* Doc. 102 at 1.  "A municipality may not be held liable where there was no underlying constitutional violation by any of its officers." *Hinton v. City of Elwood, Kansas*, 997 F.2d 774, 782 (10th Cir. 1993); *Myers v. Oklahoma Co. Bd. of Cnty Comm's*, 151 F.3d 1313, 1316 (10th Cir. 1998) ("It is well established, therefore, that a municipality cannot be liable under section 1983 for the acts of an employee who committed no

constitutional violation."). Because the Court previously concluded that Deputy Rodriguez's use of force was objectively reasonable, the Court grants summary judgment in Defendants' favor on Plaintiff's claims for municipal and supervisory liability under Section 1983.

ii.     ***Plaintiff's Claims for Wrongful Death Against Defendants Bernalillo Board of County Commissioners and Dan Houston***

Although qualified immunity does not apply to state law tort claims, because the Court concluded that Deputy Rodriguez committed no underlying state law torts against Flores, summary judgment is likewise granted in Defendants' favor on these claims as well. Immunity may be waived under the New Mexico Tort Claims Act for negligent supervision or training when the subordinate officer commits one of the enumerated torts. *See Ortiz v. New Mexico State Police*, 1991-NMCA-031, ¶ 1; NMSA 1978, § 41-4-12 (stating that immunity may be waived for wrongful death resulting from the enumerated torts). As the Court previously concluded, Deputy Rodriguez committed no battery against Flores as a matter of law. Accordingly, no waiver of immunity exists under Section 41-4-12 for these Defendants. Furthermore, to the extent that Plaintiff's claims under these counts are premised on Deputy Rodriguez's alleged negligent use of his firearm, the Court's conclusion above that any alleged negligence did not cause Flores' death also precludes a waiver of immunity of under Section 41-4-6 for these Defendants. Plaintiff's state law tort claims against Defendants Board of Bernalillo Board of County Commissioners and Dan Houston shall therefore be dismissed.

## IV.  CONCLUSION

Based on the foregoing, the Court concludes that:

1.  Defendants' Motion for Partial Summary Judgment No. I: Dismissal of Plaintiff's Fourth Amendment Excessive Force Claim (Count I) (Doc. 69) is GRANTED.

2.  Defendants' Motion for Partial Summary Judgment No. II: Dismissal of Plaintiff's State Law Claims Against Defendant Rodriguez (Counts II and III) (Doc. 68) is GRANTED

3.  Defendants' Motion for Partial Summary Judgment No. III: Dismissal of Plaintiff's Municipal Liability (Policies, Customs, Patterns, and Practices), Failure to Train, and Supervisory Liability Claims (Counts IV-VII) (Doc. 75) is GRANTED.

**IT IS SO ORDERED.**

**UNITED STATES MAGISTRATE JUDGE**
**Sitting by Consent**